JS-6

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 11-06396 RGK (VBKx) | Date | June 27, 2012 |
|---|---|---|---|
| Title | *L.R., A MINOR, etc. v. BELLFLOWER UNIFIED SCHOOL DISTRICT* | | |

| Present: The Honorable | R. GARY KLAUSNER, U.S. DISTRICT JUDGE |
|---|---|

| Sharon L. Williams | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter / Recorder |
| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
| Not Present | Not Present |

**Proceedings:** **(IN CHAMBERS)** Order re: Court Trial and Judgment

## I. INTRODUCTION

L.R., a minor, by and through his Guardian Ad Litem, Angelica Zambrano, and Angelico Zambrano (collectively, "Plaintiffs") filed a due process hearing complaint before the California Office of Administrative Hearings. The complaint alleged that Bellflower Unified School District ("Bellflower") violated the Individuals with Disabilities Education Act ("IDEA") by failing to offer L.R. ("Student") a free appropriate public education ("FAPE") pursuant to the individualized education program ("IEP") meetings of May 19, 2009 and May 21, 2010.

Administrative Law Judge Carla Garrett ("ALJ Garrett") presided over the proceedings, and identified the following three main issues:

(1) Did Bellflower deny Student a FAPE by failing to assess him in all areas of suspected disability prior to the initial May 19, 2009 IEP?
(2) Did Bellflower deny Student a FAPE in his May 19, 2009 IEP?
(3) Did Bellflower deny Student a FAPE in his May 21, 2010 IEP?

The administrative due process hearing took place over the course of five days. On June 6, 2011, ALJ Garrett issued her decision that found in favor of Bellflower on all issues.

On August 4, 2011, Plaintiffs filed the current action seeking reversal of ALJ Garrett's administrative decision. Specifically, Plaintiffs seek review and reversal of the following administrative findings:

(1) Bellflower provided Student with a FAPE relating to speech and language services pursuant to the May 9, 2009 IEP.
(2) Bellflower provided Student with a FAPE relating to adapted physical education services

          pursuant to the May 19, 2009 IEP.
(3)    Bellflower provided Student with a FAPE relating to speech and language services pursuant to the May 21, 2010 IEP.

By way of their petition, Plaintiffs pray for reversal of the administrative decision, declaratory and equitable relief, reimbursement for privately funded education services expended as a result of Bellflower's failure to provide Student a FAPE, attorneys fees, and costs.

## II.    <u>INDIVIDUALS WITH DISABILITIES ACT</u>

IDEA, 20 U.S.C. §1400 et seq., provides federal funds to assist state and local agencies in educating children with disabilities, but conditions such funding on compliance with certain goals and procedures. 20 U.S.C. §1412. IDEA's primary purpose is to assure that all children with disabilities have available to them a "free appropriate public education," ("FAPE") which emphasizes special education and related services designed to meet their unique needs. 20 U.S.C. §1400. An appropriate public education does not mean the absolutely best or potential-maximizing education for the individual child. *Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1476 (9th Cir. 1993). But rather, the states are obliged to provide a basic floor of opportunity through a program individually designed to provide educational benefit to the handicapped child. *Id.*

Under the statute, an individualized education program ("IEP") for each child with a disability is crafted annually by a team that includes a representative of the local educational agency, the child's teacher and parents, and in appropriate cases, the child. 20 U.S.C. §1414(a)(5); 34 C.F.R. §300.343(d). The IEP must contain information regarding the child's present levels of performance, a statement of annual goals and short-term instructional objectives, a statement of the specific educational services to be provided and the extent to which the child can participate in regular educational programs, and objective criteria for measuring the student's progress. 20 U.S.C. § 1401(a)(20); 34 C.F.R. § 300.346. In developing the IEP, the IEP team must consider the strengths of the child, the concerns of the parents for enhancing the child's education, the result of the most recent evaluation of the child, and the academic, developmental, and functional needs of the child. 20 U.S.C. § 1414(d)(3)(A). The methodology used to implement an IEP, even IEPs for children with autism, is left up to the district's discretion so long as it meets a student's needs and is reasonably calculated to provide some educational benefit to the child. *See Board of Educ. of Hendrick Hudson Central School Dist. v Rowley*, 458 U.S. 176, 208 (1982); *Adams v. State of Oregon*, 195 F.3d 1141, 1149 (9th Cir. 1999). An IEP is evaluated in light of the information available to the IEP team at the time it was developed; it is not judged in hindsight. *Adams*, 195 F.3d at 1149. Whether a student was denied a FAPE must be evaluated in terms of what was objectively reasonable at the time the IEP was developed. *Id.*

IDEA contains numerous procedural safeguards. In particular, IDEA requires that the parents or guardians of a disabled child be notified of any proposed change in the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to the child, and that they be permitted to bring a complaint about any matter relating to such evaluation and educational placement. 20 U.S.C. §1415(b)(1)(C)-(E). When a complaint is made, the child's parents are entitled to an impartial due process hearing conducted by a person knowledgeable in the laws governing special education and administrative hearings. 20 U.S.C. §1415(f).

## III.    <u>STANDARD OF REVIEW</u>

In any action seeking review of a hearing officer's decision, "[t]he court ... shall receive the records of the administrative proceedings; ... hear additional evidence at the request of a party; and ... basing its decision on the preponderance of the evidence, shall grant such relief as the court determines

is appropriate. 20 U.S.C. § 1415(i)(2)(C).

According to the Ninth Circuit, the District Court's standard of judicial review of the administrative decision is considered de novo. *Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467 (9th Cir. 1993). However, "[t]he court in recognition of the expertise of the administrative agency, must consider the findings carefully and endeavor to respond to the hearing officer's resolution of each material issue. After such consideration, the court is free to accept or reject the findings in part or in whole.... Despite their discretion to reject the administrative findings after carefully considering them, however, courts are not permitted simply to ignore the administrative findings ... at bottom, the court itself is free to determine independently how much weight to give the administrative findings in light of the enumerated factors." *San Diego v. Cal. Special Educ. Hearing Office*, 93 F.3d 1458, 1466 (9th Cir. 1993) (citing *Ojai*, 4 F.3d at 1476). Therefore, "although the District Court independently reviews the evidence and thereafter issues a decision supported by a preponderance of the evidence, the court must give 'due weight' to the hearing officer's prior decision." *Glendale Unified Sch. Dist. v. Almasi*, 122 F. Supp. 2d 1093, 1100 (C.D. Cal. 2000).

The burden of proof lies with the party challenging the due process hearing decision. *See Board of Educ. of Community Consol. School Dist. No. 21 v. Illinois State Board of Education*, 938 F.2d 712, 716 (7th Cir. 1991); *see also Clyde K. v. Puyallup School Dist., No. 3*, 35 F.3d 1396, 1398-99 (9th Cir. 1994), *superceded by statute on other grounds*.

## IV. <u>FINDINGS OF FACT</u>

ALJ Garrett's Decision is seventy-five pages in length, with fifty of those pages devoted to a detailed findings of fact. The Court has reviewed the Decision and the evidence contained in the Administrative Record and Transcript, particularly in the portions of findings with which Plaintiffs disagree. The Court finds ALJ Garrett's Findings of Fact accurate and thorough. With the applicable standard of review in mind, the Court hereby adopts the Findings of Fact as written in ALJ Garrett's June 6, 2011 Decision.

To place the Court's Conclusions of Law in context, however, the Court will summarize below the relevant portions of the Findings of Fact it has adopted.

Between January 27, 2009 and May 5, 2009, beginning when Student was three and one-half years old, Student underwent various assessments, first by Dr. Hyun Park, of Stramski Child Development Center ("Stramski"), then by Bellflower. Dr. Park diagnosed Student with mild autism, atypical social skills, communication impairments, and restricted patterns of interest and activities. Dr. Park made recommendations consistent with these findings, as well as findings based on possible medical issues attributable to Student's physical and cognitive development.

Bellflower's assessment was conducted by the school psychologist, adapted physical education ("APE") teacher, and speech and language pathologist. Nina Rezvani, the school psychologist, conducted a psychoeducational assessment, including assessments for cognitive development and adaptive behavior. Overall, Ms. Rezvani concluded that Student exhibited delays in the areas of cognitive functioning, adaptive behaviors, and socialization, and had significantly low communication skills. Sandra Lex, the speech and language pathologist, assessed Student's expressive and receptive language. Ms. Lex also attempted to conduct an oral-motor examination, but Student would not allow it. She therefore relied on Mother to provide information about Student's oral-motor skills. Ms. Lex concluded that, overall, Student's communication skills were at the 12-month level, with scattered skills to the 18-month level. Terri Taylor, the APE specialist, measured Student's fine and gross motor skills. Student did not attempt a number of gross motor tasks. However, Ms. Taylor did observe that Student

could perform a number of skills, such as walking well, throwing a ball with both hands, kicking a stationary ball with force, and walking up and down stairs one at a time. Because Ms. Taylor did not have a firm grasp on Student's gross motor skills, she declined to make a recommendation that Student receive APE, preferring instead to observe the child again in his placement. Based on the results of the Bellflower assessment, Bellflower concluded that Student did not appear to have autism, and determined that Student qualified for special education under the category of speech and language impairment.

At a May 19, 2009 meeting, the IEP team drafted an IEP that included a statement of Student's present levels of performance, and established seven measurable goals and objectives to address Student's communication, cognitive, self-help, and fine motor deficits. The team placed Student in the preschool special day class for 17.5 hours per week. Based on a recommendation by Ms. Lex, the team also determined that Student would receive twice a week, 20-minute sessions of group speech and language therapy. Ms. Lex explained that her recommendation was based on the attention span of a preschooler, and the ability for the children to interact with each other without the danger of a child becoming shy or feeling singled out. The group sessions generally consisted of two to three preschool special day class students. The team did not offer APE services, as Ms. Taylor did not recommend such services in the report, and because APE specialists worked with the preschool special day class as a whole, on a weekly basis. Mother consented to the May 19, 2009 IEP.

In July 2009, when Student was four years old, Dr. Armando de Armas conducted an assessment of Student for the Harbor Regional Center to determine if Student qualified for services at the center. Based on his assessment, Dr. de Arnas concluded that Student's greatest difficultly was with language. Dr. de Arnas also thought it was possible that Student was intellectually handicapped rather than autistic.

In September 2009, Student began attending Bellflower's preschool special day class. On December 10, 1009, Mother requested an IEP meeting, in light of the three different diagnoses from Stramski, Bellflower, and Harbor Regional Center. Mother's primary concern was Student's speech and language development, and raised the issue of possible apraxia. The team was not able to comment on whether Student suffered from apraxia. However, after reviewing Student's progress in the area of speech and language skills, the team added an additional speech and language goal with increased oral opening in response to objects, pictures, and games. Mother consented to this goal, and on December 16, 2009, the May 19, 2009 IEP was amended to include the new goal.

In February 2010, Student's expert witness, Dr. Robin Morris, conducted a psychoeducational assessment of Student. Prior to conducting any tests, Dr. Morris reviewed the Stramski reports, Bellflower's initial assessment, the May 19, 2009 IEP, and Dr. de Arnas's report. Dr. Morris disagreed with the number of tests given by Bellflower, the scoring of the tests, and Bellflower's conclusion about whether Student met the eligibility requirements for autistic-like behaviors. Dr. Morris then conducted her own extensive testing and assessment, and concluded that Student had autism and met the eligibility criteria for special education as a child with autistic-like behaviors. Based on these conclusions, Dr. Morris opined that Student would not be able to master the goals listed in the May 19, 2009 IEP. Dr. Morris made recommendations consistent with her conclusions. Mother provided Bellflower with a copy of Dr. Morris's report.

In March 2010, Student's preschool special day class teacher, Lori Alvarado, conducted an assessment of Student to determine Student's progress. Alvarado's assessment included the areas of preacademic skills, prevocational skills, communication skills, gross motor skills, fine motor skills, social-emotional skills, and self-help skills. Alvarado concluded that Student had met or exceeeded some of his goals set forth in his May 19, 2009 IEP. Alvarado also concluded that Student had made either some or substantial progress on his remaining goals.

On March 29, 2010, the IEP team met to discuss Mother's concerns regarding Student's home behaviors and to present Dr. Morris's report. At the meeting, a discrepancy between Student's behavior at home and Student's behavior at school was brought to light and discussed. Specifically, while Mother reported a lot of crying and tantrums at home, the Bellflower team members reported that Student was happy, cooperative, and compliant at school, and demonstrated significant progress. Dr. Morris then presented her report and shared her recommendations. The Bellflower members disagreed with Dr. Morris's diagnosis, maintaining that Student had not demonstrated to Bellflower that he had autism. Mother requested an occupational therapy assessment of Student, and Bellflower agreed.

On April 20, 2010, when Student was four years and ten months old, Adian DeDoes, of Gallagher Pediatric Therapy, conducted an occupational therapy assessment of Student. Based on his observations and testing, DeDoes concluded that, although Student's overall development was behind his chronological age, he appeared to have the ability to benefit from his special education program without difficulty. Accordingly DeDoes did not recommend occupational therapy services at the time of this assessment.

On May 13, 2010, when Student was four years and eleven months old, Alvarado administered the Brigance test to get a better idea of Student's present levels of performance. The test is designed to assess a child's performance in the areas of (1) language, (2) motor, (3) academic/cognitive, (4) daily living, and (5) adaptive living. In the five areas of testing, Student's scores represented an age equivalent ranging from two year and eight months, to four years. Student's score was lowest in the area of language. Alvarado noted that 25 percent of Student's speech was unintelligible.

On May 21, 2010, an IEP team meeting was held to discuss Student's program for the 2010-2011 school year. DeDoes presented his occupational therapy report, then the team discussed Student's present levels of performance. The team noted that Student met all of his goals, and developed five new goals. The team also developed some language and communication goals. Bellflower offered Student placement in the kindergarten special day class for 390 minutes per day. The IEP noted that Student still had communication, cognitive, socialization, and self-help deficits that required small group support and specialized teaching methods to address Student's delays. Bellflower also offered an immediate increase of speech and language services from two, 20 minutes sessions per week, to three 20 minute sessions per week, with one of those sessions designated for individual services. Mother expressed a lack of progress by Student from the previous year, and requested an Applied Behavior Analysis ("ABA") assessment to determine if Student should receive ABA therapy. Alvarado advised that Students' behaviors in school were appropriate and did not warrant assessment. Consequently, Mother's request was denied.

On May 26 and 28, 2010, Ms. Taylor, the adapted physical education teacher, conducted an APE assessment of Student. Ms. Taylor decided to conduct the assessment because she had been out on medical leave since September 2009, and after returning to work in February 2010, she noticed Student lacked certain skills that he should have had, such as hopping, galloping, catching, throwing, and kicking a ball. She had not been able to assess for these skills during her initial assessment in May 2009 because Student was reluctant to perform some of the tasks she requested. After the May 2010 assessment, Ms. Taylor concluded that Student's gross motor skills were delayed by one year and five months to two years and five months. Ms. Taylor recommended that Student receive APE services to help him improve his movement skills. Specifically, Ms. Taylor recommended two days per week, 25 minutes per session, of small group APE services. On June 9 2010, the May 21, 2010 IEP was amended to add the APE services recommended by Ms. Taylor, and to add two motor skills goals. Mother consented to the amendment.

On May 27, 2010, Student's expert witness and licensed speech pathologist, Dawn Winkelmann, prepared a report of a private speech and language assessment she conducted on Student on April 27,

2010. Winkelmann reviewed medical and school records. Based on the profound gap between Student's chronological age and his expressive and receptive skills, Winkleman expected Bellflower to have provided a minimum of two hours per week of individual therapy, delivered by a credentialed speech and language pathologist. Winkelmann also administered her own testing of Student. Winkelmann concluded that Student had a severe apraxia component to his unintelligible speech, oral dysarthia, suspected feeding and swallowing disorder to be evaluated, articulation disorder, expressive and receptive language disorder, and poor pragmatic skills. She recommended that Student receive increased speech therapy at school to two hours per week. Winkelmann also included in her report 12 cognition goals, 10 expressive language goals, five receptive language goals, seven motor goals, and four speech goals. This report was not provided to Bellflower.

In May 2010, Student began receiving therapy from Winkelmann for one hour per week, paid for by Mother. Currently, student has accomplished 70 percent of the goals.

At the ALJ hearing, Winkelmann testified as to the appropriateness of the goals presented in the May 19, 2009 and May 21, 2010 IEPs. She found the May 2009 goals insufficient. Specifically, the goals failed to address Student's articulation, oral-motor, apraxia, and expressive communication needs. Additionally, the oral-motor goal subsequently added to Student's IEP on December 16, 2009 was inappropriate because it focused on Student's mouth being open. Given the constant state of Student's slack mouth, Winkelmann stated that he should have received a goal requiring him to keep his mouth closed more. As to the May 2010 IEP, Winkelmann disagreed with the baselines set forth in Student's three speech and communication goals. Therefore, Winkelmann concluded that the goals developed from these inaccurate baselines were inappropriate.

Winkelmann was unfamiliar with the services provided in the preschool or kindergarten special day classes.

## V.    CONCLUSIONS OF LAW

Plaintiffs seek reversal of the following legal conclusions issued by ALJ Garrett:
(1) Bellflower provided Student with a FAPE relating to speech and language services pursuant to the May 19, 2009 IEP and the May 21, 2010 IEP; and (2) Bellflower provided Student with a FAPE relating to adapted physical education services pursuant to the May 19, 2009 IEP. Upon review of the record, the Court affirms ALJ's decisions as to these issues, and addresses each in turn.

### A.    Speech and Language Services (May 19, 2009 and May 21, 2010 IEPs)

As to speech and language services in 2009 and 2010, Plaintiffs argue that ALJ Garrett erred by not considering Plaintiffs' expert, Dawn Winkelmann's, assessment of Student and testimony about that assessment. The Court disagrees.

The Ninth Circuit has held that the actions of the school district cannot be judged exclusively in hindsight, as an IEP is a snapshot, not a retrospective. *Adams v. State of Oregon*, 195 F.3d 1141, 1149 (9th Cir. 1999). "In striving for 'appropriateness,' an IEP must take into account what was, and was not, objectively reasonable when the snapshot was taken, that is, at the time the IEP was drafted." *Id*. However, after-acquired evidence may shed light on the objective reasonableness of a school district's actions at the time the school district rendered its decision. *E.M. v. Pajaro Valley Unified School District*, 652 F.3d 999, 1004 (9th Cir. 2011)(citing *Adams*, 195 F.3d at 1149). Therefore, as pointed out by Plaintiffs, there is no bar to considering subsequently acquired evidence.

Pursuant to the May 19, 2009 IEP meeting, the IEP team placed Student in the preschool special

day class for 17.5 hours per week. The preschool special day class designated in the IEP was designed for students with varying degrees of speech and language delays. Every aspect of the class focused on language enrichment. In addition to the special day class, Student also received, twice a week, a 20-minute session of group speech and language therapy. Sandra Lex, the speech and language pathologist, recommended 20 minute group sessions based on Student's expected attention span, and the goals of allowing Student to identify and interact with other students and avoiding the child's becoming shy or feeling singled out. ALJ Garrett was asked to consider whether these speech and language services were objectively reasonable and adequate.

Contrary to Plaintiffs' assertions, ALJ Garrett did not refuse to consider the testimony of Winkelmann. In her Factual Findings, ALJ Garrett spends six full pages detailing Winkelmann's opinion regarding Bellflower's assessments, Winkelmann's's own assessments, and her conclusions and recommendations. In her analysis, ALJ Garrett appropriately weighed the evidence before her and found Winkelmann's testimony carried little weight. Specifically, ALJ Garrett found, "[g]iven the significant passage of time between the May 19, 2009 IEP, and Ms. Winkelmann's April 2010 assessment, Ms. Winkelmann's opinions relative to Student and the extent of services she believed he should have received back in May 2009, *are afforded little weight for the purpose of this analysis*." (Administrative Record, Ex. 13, p 65 (emphasis added).) The record shows that ALJ Garrett thoroughly considered the qualifications of each expert, including Winkelmann, the various assessments and reports made by these experts, and the time periods in which these reports and assessments were made. In doing so, ALJ Garrett carefully weighed the evidence and arrived at her conclusion. The Court finds that ALJ Garrett's reasons for affording Winkelmann's testimony little weight is well-reasoned and supported by the evidence.

ALJ Garrett also considered whether Bellflower provided objectively reasonable and adequate speech and language therapy in Student's May 21, 2010 IEP. Again, the Decision indicates that Winkelmann's testimony was, in fact, considered. In addition to the thorough recitation of Winkelmann's opinions, assessments, and recommendations, the Decision states:

> Student relies on Ms. Winkelmann's conclusion that Student had developmental verbal apraxia, which she testified caused Student's unintelligible speech, and her recommendation that Student required a minimum of two hours per week of individual speech and language therapy. Ms. Winkelmann also disagreed with the baselines set forth in the speech and language goals. However, Ms. Winkelmann did not attend the May 21, 2010 IEP meeting to discuss her finding or to refute the baselines, and there is no evidence that either Ms. Winkelmann or Student provided the team with information concerning her assessment. Consequently, at the time of the development of the May 21, 2010 IEP, the team only had assessment information from members of the IEP team, which appeared valid and reasonable, given the Student's past progress and present levels of performance. Given the information available to the team, the team was objectively reasonable in the offer of speech and language services it made to Student.

(Administrative Record, Ex. 13, p. 72-73.) ALJ Garrett clearly suggests that, even in the face of Winkelmann's testimony, the assessments performed on Student prior to the May 21, 2010 IEP meeting were valid and reasonable at that time. Upon review of the record, the Court finds that the evidence supports this finding. ALJ Garrett further found that, in light of the information derived from these assessments, the IEP team was objectively reasonable in offering the speech and language services it made to Student. Again, the Court finds that the evidence supports ALJ Garrett's findings. The record indicates that the various experts who assessed Student prior to May 21, 2010 had differing opinions about the nature and extent of Student's disabilities and the recommended course of treatment. The

qualifications of Student's expert did not outweigh those of Bellflower's in any substantial or meaningful way. Nor did the testing methods used by Bellflower appear unreasonable. Moreover, Student showed moderate to substantial progress in each of the focus areas. While it is possible that Winkelmann's opinions may have yielded a different IEP, that information was not available at the May 21, 2010 IEP meeting. Further, even considering Winkelmann's opinions in hindsight, the evidence, by itself, fails to vitiate the reasonableness of Bellflower's assessment of Student and its resulting offer of speech and language services at the time they were made.

## B.     Adapted Physical Education Services (May 2009 IEP)

Terri Taylor, Bellflower's adapted physical education ("APE") specialist, was unable to fully assess Student's gross motor skills at the 2009 initial assessment. However, she did observe that Student could perform a number of skills, and noted that Student appeared to be in the low average to average range. In light of this assessment, and because Ms. Taylor did not have a firm grasp on Student's gross motor skills, she declined to make a recommendation that Student receive APE, preferring instead to observe the child again in his placement.

Plaintiffs point out that a subsequent APE Assessment conducted in May 2010, after Ms. Taylor returned from a five month medical leave, resulted in the inclusion of APE services in the May 2010 IEP. Plaintiffs argue that evidence related to this issue clearly shows that Student should have received adapted physical education services in his May 2009 IEP. The Court disagrees.

The evidence shows that APE specialists at Bellflower worked with the preschool special day class, as a whole, on a weekly basis, to address gross motor needs. At the initial 2009 assessment, Student would not perform a number of tasks. However, Ms. Taylor observed that Student could walk well, throw a ball with both hands, kick a stationary ball with force, and walk up and down stairs one at a time. Additionally, Mother reported that Student could jump on two feet. Despite that fact that Student did not complete all of the tasks asked of him, Ms. Taylor was able to assess Student's gross motor skills at the low average to average range, based on the information she had. Given the results of this assessment, it was reasonable for Ms. Taylor to prefer waiting to observe Student again in his placement. The Court also agrees that Bellflower was objectively reasonable in concluding that Student's APE needs could be addressed within the preschool special day class, and no individual APE services were needed at the time.

Ms. Taylor's May 2010 recommendation for APE services were based on an assessment of Student's motor skills made on May 26 and 28, 2010. Ms. Taylor testified that she conducted the assessment because, after returning to work in February 2010, she notice Student lacked certain skills that he should have had, such as hopping on one foot, and galloping, and catching, throwing, and kicking a rolling ball with greater ease. Plaintiffs argue that these obvious deficits should have been noted at the initial assessment or, at the very latest, during the weekly group APE. Plaintiffs' argument is unavailing. First, the evidence shows that Ms. Taylor was unable to get a full assessment on Student's motor skills in 2009. However, based on (1) her observation of the motor tasks Student had performed, (2) the APE services included in the special day class program, and (3) not having a firm grasp of what he could and could not do, Ms. Taylor did not recommend additional APE services. In light of the information Bellflower had at that time, this determination was reasonable. The deficits in Student's motor skills observed in 2010 resulted in APE services in Student's May 21, 2010 IEP. However, this information is not determinative of what would have been reasonable in 2009. Plaintiffs have failed to offer any evidence showing that even if these same deficits had they been observed in 2009, when Student was a year younger, additional APE services should have been offered. Therefore, Plaintiffs have failed to meet his burden on this issue.

## VI.     CONCLUSION

      Based on the foregoing, the Court hereby finds in favor of Bellflower on all issues brought on appeal, and affirms ALJ Garrett's Decision as to those matters.

      **IT IS SO ORDERED**.

|  | : |  |
|---|---|---|
| Initials of Preparer | slw |  |